## STEPHEN R. FERRUCCI III *v.* TOWN OF MIDDLEBURY ET AL.
### (AC 32271)

Gruendel, Lavine and Bear, Js.

Argued May 26—officially released September 6, 2011

*Thomas G. Moukawsher*, for the appellant (plaintiff).

*Nicole D. Dorman*, for the appellee (named defendant).

*Opinion*

GRUENDEL, J. This appeal concerns the proper interpretation of a municipal retirement plan. The plaintiff,

Stephen R. Ferrucci III, appeals from the summary judgment rendered by the trial court in favor of the defendant, the town of Middlebury.[1] He claims that the court improperly concluded that no genuine issue of material fact existed as to (1) his eligibility for a "normal retirement" benefit pursuant to the provisions of the defendant's retirement plan (plan) and (2) his claim of promissory estoppel. We affirm the judgment of the trial court.

The record, viewed in the light most favorable to the plaintiff; see *Martinelli* v. *Fusi*, 290 Conn. 347, 350, 963 A.2d 640 (2009); reveals the following facts. The plaintiff was born on November 2, 1949, and was hired by the defendant as a full-time police officer on December 1, 1974. He was a member of a bargaining unit comprised of police officers that negotiated a series of collective bargaining agreements with the defendant, including one effective July 1, 1988, to June 30, 1990. That agreement required, inter alia, the defendant to "maintain in effect for the duration of this [a]greement the [plan] dated July 1, 1967, as amended on February 14, 1973."

The plaintiff retired as a full-time police officer at the age of thirty-eight on October 24, 1988. At that time, he had attained almost fourteen years of credited service with the defendant. In his deposition testimony, which was submitted in support of the defendant's motion for summary judgment, the plaintiff averred that he "left that job [with the defendant] for . . . a better working schedule" and further that he had secured a position with "Local 760 of the . . . Service Employees

[1] Also named as defendants in the plaintiff's original complaint were Michael W. Beldon, Edward G. Asselin and John Dibble. The court thereafter granted a motion to strike all counts against those individuals and rendered judgment in their favor when the plaintiff declined to replead. Accordingly, we refer to the town of Middlebury as the defendant in this appeal.

International Union," with whom he subsequently worked for more than two decades.

Seven years after terminating his employment with the defendant, the plaintiff contacted the defendant's finance director seeking information about his retirement benefit under the plan. The finance director, in turn, contacted the plan's actuary, who, in a letter dated December 4, 1995, calculated that the plaintiff would become eligible for a monthly benefit of $658.89 pursuant to the normal retirement provisions of the plan beginning December 1, 2004. Once informed of that calculation, the plaintiff met with a financial advisor, modified certain contributions to a variable annuity contract and made plans to retire from his current employment at a date certain.[2]

---

[2] Appended to the plaintiff's March 3, 2010 memorandum of law in opposition to the defendant's motion for summary judgment was the March 2, 2010 affidavit of the plaintiff. In that affidavit, the plaintiff avers in relevant part: *"When I was deciding to retire* from the [defendant] police department as a full time police officer in October, 1988 with about fourteen years of service, I asked the [finance director] how I could obtain the amount of my pension benefit should I retire and when I would start receiving a monthly benefit. . . . [The finance director] later called me and told me the answer to my question had been delivered to him by the actuary. I went to Town Hall and was given a letter by [the finance director] that was marked confidential. . . . The letter . . . informed me that my pension would be $658.89 per month starting the month I reached my fifty-fifth birthday. . . . *My decision to retire from the [defendant's] police department and to accept work in another field of work was based on the calculations I received in the letter given to me by [the finance director]."* (Emphasis added.) Those statements contradict the plaintiff's deposition testimony, in which he acknowledges that he contacted the finance director in 1995, and received the actuary's letter in December, 1995, seven years *after* his retirement, as well as the actuary's letter itself, which the defendant submitted in support of its motion for summary judgment and which is dated December 4, 1995. In his appellate brief, the plaintiff likewise disavows the allegations contained in the aforementioned affidavit, stating in relevant part: "[The plaintiff] left the [police department] in 1988 at age thirty-eight. In 1995 while planning his own retirement . . . [h]e asked the [defendant] to confirm his benefits . . . . [The finance director] gave [him] a calculation showing that . . . he would receive his normal retirement benefit of $658.89 at age fifty-five . . . . The document was prepared for [the defendant] by [the actuary]."

In 2002, the defendant's retirement committee consulted with the plan's actuary. In response, the actuary prepared a December 12, 2002 letter, a copy of which was provided to the plaintiff, which stated that the plaintiff would not be entitled to a monthly benefit pursuant to the normal retirement provisions of the plan on December 1, 2004. Rather, it stated that the plaintiff could receive a reduced monthly benefit of $263.56 pursuant to the early retirement provisions of the plan on that date and would qualify for the $658.89 normal retirement benefit on December 1, 2014. On October 15, 2004, the plaintiff agreed to receive the reduced benefit while reserving his right to contest the denial of the normal retirement benefit.[3]

The plaintiff commenced the present litigation in 2006. His March 21, 2007 amended complaint contained two counts against the defendant alleging breach of contract and promissory estoppel. On June 8, 2009, the defendant filed a motion for summary judgment, to which it attached in support thereof a copy of the plan and portions of the plaintiff's deposition testimony. See Practice Book § 17-45. Following argument thereon, the court rendered summary judgment in the defendant's favor, and this appeal followed.

Before considering the precise claims presented on appeal, we note the well established standard of review. "Practice Book § [17-49] requires that judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A material fact is a fact that will make a difference in the result of the case. . . . The facts at issue are those alleged

---

[3] Although not an issue in light of the plaintiff's election to receive a reduced benefit, as will be explained in part I of this opinion, the plain language of the plan precludes the plaintiff from receiving a normal retirement benefit in 2014, the actuary's assessment notwithstanding.

in the pleadings. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue as to all material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. . . . The party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. See Practice Book §§ [17-44 and 17-45]. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The test is whether a party would be entitled to a directed verdict on the same facts. . . . A motion for summary judgment is properly granted if it raises at least one legally sufficient defense that would bar the plaintiffs claim and involves no triable issue of fact. . . . Our review of the trial court's decision to grant a motion for summary judgment is plenary." (Citation omitted; internal quotation marks omitted.) *Weiner* v. *Clinton,* 106 Conn. App. 379, 382–83, 942 A.2d 469 (2008).

I

The plaintiff first contends that the court improperly concluded that no genuine issue of material fact existed as to his eligibility for a normal retirement benefit under the plan. We disagree.

Resolution of the plaintiff's claim involves interpretation of the plan. "It is axiomatic that a collective bargaining agreement is a contract." *D'Agostino* v. *Housing Authority,* 95 Conn. App. 834, 838, 898 A.2d 228, cert. denied, 280 Conn. 905, 907 A.2d 88 (2006); see also *O'Connor* v. *Waterbury,* 286 Conn. 732, 743–49, 945 A.2d 936 (2008) (interpreting collective bargaining agreement under contract law principles). Similarly, our Supreme Court has held that statements contained in a written retirement plan give rise to an employer-employee contract. See *Dolak* v. *Sullivan,* 145 Conn. 497, 503, 144 A.2d 312 (1958).

"The law governing the construction of contracts is well settled. When a party asserts a claim that challenges the . . . construction of a contract, we must first ascertain whether the relevant language in the agreement is ambiguous. . . . A contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . Accordingly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact. . . . If a contract is unambiguous within its four corners, intent of the parties is a question of law requiring plenary review. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . ." (Citation omitted; internal quotation marks omitted.) *O'Connor* v. *Waterbury*, supra, 286 Conn. 743–44.

The plan specifies four kinds of retirement: normal retirement, early retirement, automatic retirement and disability retirement. The plaintiff concedes that he is not eligible for either an automatic retirement or a disability retirement. Accordingly, the salient inquiry is whether he qualifies for a normal requirement or early retirement under the plan.

As a preliminary matter, Article II of the plan sets forth various definitions to be used therein. In Article II, § 20, "normal retirement date" is defined in relevant part as follows: "[T]he 'Normal Retirement Date' of a policeman means the first day of the month coincident with or next *following the later of* (i) the date on which he completes twenty-five (25) years of Credited Service or (ii) the date on which he attains age fifty-five (55), but in no event later than (iii) his sixty-fifth (65th)

birthday." (Emphasis added.) The term "normal retirement date" is used in both the normal retirement and early retirement sections of the plan.

The requirements for a normal retirement are set forth in Article V, § 1, of the plan. That section provides in relevant part that "[a]ny [m]ember who on or after the [e]ffective [d]ate (i) shall attain his [n]ormal [r]etirement [d]ate, (ii) shall have completed at least ten (10) years of [c]redited [s]ervice and (iii) shall thereafter retire, shall be entitled to receive a monthly normal retirement benefit upon application therefor. . . . Such monthly normal retirement benefit shall be equal to 1 1/2 [percent] of the [m]ember's [a]verage [m]onthly [s]alary, multiplied by his years and tenths-of-a-year of [c]redited [s]ervice, not in excess of thirty (30) years."

The requirements for an early retirement are set forth in Article V, § 2, of the plan, which provides in relevant part that "[o]n or after the [e]ffective [d]ate, any [m]ember whose employment with the [defendant] terminates prior to his [n]ormal [r]etirement [d]ate, and who has attained age fifty-five (55) and who has ten (10) or more years of [c]redited [s]ervice may retire . . . . A member so retired will receive, upon application therefor, a benefit commencing at time of early retirement computed in accordance with [s]ection 1 of this Article V on the basis of his [c]redited [s]ervice and [a]verage [m]onthly [s]alary at the time of early retirement, but reduced by 1/2 of 1 percent for each complete calendar month by which the date of commencement of such [m]ember's early retirement benefit precedes his [n]ormal [r]etirement [d]ate."

The plaintiff's claim before the trial court, which he renews on appeal, centers on his reading of the definition of normal retirement date contained in Article II, § 20. As he states in his appellate brief, the plaintiff "believed [the definition] meant that normal retirement

could happen once a police officer had either [twenty-five] years of service or had reached age [fifty-five]. He believed that for a police officer who leaves after [fourteen] years of service the later date is the date he turns [fifty-five]." For two distinct reasons, the plaintiff is mistaken.

First and foremost, we are mindful that "a contract's meaning is contextual." *Honulik* v. *Greenwich*, 290 Conn. 421, 453, 963 A.2d 979 (2009); see *Levine* v. *Advest, Inc.*, 244 Conn. 732, 753, 714 A.2d 649 (1998) ("[t]he individual clauses of a contract . . . cannot be construed by taking them out of context and giving them an interpretation apart from the contract of which they are a part"). Thus, the definition of normal retirement date contained in Article II, § 20, of the plan must be read in context of the provisions delineating what constitutes a normal retirement under Article V, § 1. To secure a normal retirement thereunder, an employee must "attain his normal retirement date" as a condition precedent to his retirement. As Article V, § 1, provides in relevant part: "Any [m]ember who on or after the [e]ffective [d]ate (i) shall attain his [n]ormal [r]etirement [d]ate . . . *and (iii) shall thereafter retire*, shall be entitled to receive a monthly normal retirement benefit upon application therefor. . . ." (Emphasis added.) In the present case, assuming arguendo that the plaintiff is correct that he merely had to attain the age of fifty-five to meet the definition of normal retirement date, his claim nevertheless fails because he did not *thereafter retire*. Rather, he retired more than sixteen years prior to reaching that milestone. Put simply, the plaintiff's interpretation—that he is free to retire at the age of thirty-eight, reach the age of fifty-five some sixteen years later, and still qualify for a normal retirement benefit—cannot be reconciled with the plain and unambiguous language of Article V, § 1, of the plan.

Apart from that shortcoming, the plaintiff's claim suffers an additional infirmity. "[I]n construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous." (Internal quotation marks omitted.) *Connecticut National Bank* v. *Rehab Associates*, 300 Conn. 314, 322, 12 A.3d 995 (2011). The plaintiff argues that the definition of normal retirement date contained in Article II, § 20, indicates that the normal retirement date of a police officer occurs on either (1) the date on which he completes twenty-five years of credited service or (2) the date on which he attains age fifty-five. His interpretation renders meaningless the critical prefatory language in Article II, § 20, specifying that the normal retirement date of a police officer occurs "following the later of" those two milestones. In the present case, the plaintiff retired in 1988. At that time, he was thirty-eight years old and had accumulated approximately fourteen years of credited service. Accordingly, when he turned fifty-five in 2004, that milestone was not "the later of" the two specified milestones contained in Article II, § 20, because he, at that time, had not yet accumulated twenty-five years of service. If, instead of retiring in 1988, the plaintiff had continued working as a full-time police officer for the defendant until 2004, he would have attained twenty-five years of service in 1999, and, thus, when he reached age fifty-five in 2004, that age milestone would qualify as "the later of" the two milestones set forth in Article II, § 20. Because he did not attain twenty-five years of service, his turning age fifty-five being "the later of" the two milestones is a legal impossibility.[4]

---

[4] To be clear, under the plain terms of the plan, a full-time police officer with twenty-five years of credited service is eligible for a normal retirement, at the earliest, upon attaining age fifty-five. If that officer does not have twenty-five years of credited service when turning fifty-five, the eligibility requirements for a normal retirement set forth in the plan require him to work until (1) he attains twenty-five years of credited service sometime after turning fifty-five or (2) he attains age sixty-five.

In sum, under the plain and unambiguous terms of the plan, to be eligible for a normal retirement, the plaintiff had to "attain his [n]ormal [r]etirement [d]ate" and *thereafter* retire. It is undisputed that, at the time of his retirement in 1988, the plaintiff had not attained twenty-five years of service or the age of sixty-five. Rather, his employment with the defendant terminated prior to his normal retirement date, thus qualifying him for an early retirement pursuant to Article V, § 2, of the plan. We therefore conclude that the court properly determined that no genuine issue of material fact exists as to his eligibility for a normal retirement benefit under the plan.

## II

The plaintiff also argues that the court improperly concluded that no genuine issue of material fact existed as to his claim of promissory estoppel. In response, the defendant maintains that the court properly determined that the claim was barred by the doctrine set forth in *Fennell* v. *Hartford*, 238 Conn. 809, 681 A.2d 934 (1996). We agree with the defendant.

Accordingly, our analysis begins with a review of that doctrine. In *Fennell*, our Supreme Court rejected a claim that a representation contained in a pension manual that was not "executed in compliance with mandatory conditions prescribed in the [city] charter or statutes"; (internal quotation marks omitted) id., 819; nevertheless gave rise to an implied contract that conferred additional retirement benefits to the municipal employee plaintiffs. Id., 826–27. The court began its analysis "with a review of several general principles regarding municipal charters and municipal corporations and their employees. It has been well established that a city's charter is the fountainhead of municipal powers . . . . The charter serves as an enabling act, both creating power and prescribing the form in which

it must be exercised. . . . Agents of a city . . . have no source of authority beyond the charter. . . . In construing a city charter, the rules of statutory construction generally apply. . . .

"The officer, body or board duly authorized must act [on] behalf of the municipality, otherwise a valid contract cannot be created. Generally the power to make contracts on behalf of the municipality rests in the council or governing body . . . . Generally, no officer or board, other than the common council, has power to bind the municipal corporation by contract, unless duly empowered by statute, the charter, or authority conferred by the common council, where the latter may so delegate its powers . . . . It follows that agents of a city, including its commissions, have no source of authority beyond the charter. [T]heir powers are measured and limited by the express language in which authority is given or by the implication necessary to enable them to perform some duty cast upon them by express language. . . . [A]ll who contract with a municipal corporation are charged with notice of the extent of . . . the powers of municipal officers and agents with whom they contract, and hence it follows that if the . . . agent had in fact no power to bind the municipality, there is no liability on the express contract . . . . Thus, every person who deals with [a municipal corporation] is bound to know the extent of its authority and the limitations of its powers." (Citations omitted; internal quotation marks omitted.) Id., 813–14.

In addressing the precise claim presented by the municipal employee plaintiffs, our Supreme Court noted that "[c]ourts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis for a contract or an estoppel. . . . We believe that implied contract claims in the public sector, based upon pension or employee manuals, would only invite

endless litigation over both real and imagined claims of misinformation by disgruntled citizens [and employees], imposing an unpredictable drain on the public fisc. . . .

"On the basis of the above considerations, we cannot superimpose implied contract principles upon the terms of the plaintiffs' pension based upon a representation in a pension manual. We conclude, as a matter of law, that the pension manual created and distributed by the commission could not confer any additional benefits not provided for by the city's charter. . . .

"[T]he charter provides that [e]xcept as otherwise provided in this charter all powers vested in the city shall be exercised by the court of common council . . . . Hartford Charter, c. II, § 8. Pursuant to General Statutes § 7-450, an enabling statute, the Hartford city council adopted chapter XVII, § 3, of the Hartford charter, which created the municipal employees' retirement fund. Pursuant to the charter and the statute, the power to amend the city's municipal employees' retirement fund rests solely with the city council.

"In order for additional retirement or pension benefits to be conferred on the plaintiffs and other city employees, the city council must adopt ordinances in compliance with the statutory and charter mandates. . . . The plaintiffs concede that this was not done. If additional benefits were allowed to be conferred in any other manner, the actions of the [pension] commission would impinge on the city council's legislative prerogative to oversee the maintenance of the city's municipal employees' retirement fund. . . . In sum, the commission was without authority to confer additional benefits through the pension manual." (Citations omitted; internal quotation marks omitted.) Id., 816–18. The court concluded its analysis by declaring that "no ratification or estoppel can make lawful a municipal contract which

is beyond the scope of the corporate powers, or which is not executed in compliance with mandatory conditions prescribed in the charter or statutes . . . ." (Internal quotation marks omitted.) Id., 818–19.

This court subsequently rejected an attempt to limit the scope of the doctrine articulated in *Fennell*, concluding that the doctrine is not "limited to claims of implied contract that are based on pension or employee manuals." *Biello* v. *Watertown*, 109 Conn. App. 572, 583, 953 A.2d 656, cert. denied, 289 Conn. 934, 958 A.2d 1244 (2008). In *Biello*, the plaintiff accepted the newly created position of assistant superintendent of the water and sewer authority following a restructuring of the public works department. Id., 574. At that time, "[t]he water and sewer authority recommended to the town council that the plaintiff's salary as assistant superintendent be set [at a certain amount] . . . . Although the town council approved the position of assistant superintendent, it declined to approve the salary recommended by the water and sewer authority. Instead, the town council approved a salary in the same amount that the plaintiff had been receiving in his former position as supervisor." Id., 574–75. After the defendant municipality refused to pay him the salary recommended by the water and sewer authority, the plaintiff filed a complaint alleging breach of an implied contract, unjust enrichment, quantum meruit and breach of the implied covenant of good faith and fair dealing. Id., 576. On appeal, this court reasoned that, the plaintiff's contentions to the contrary, the *Fennell* doctrine "is dispositive of the plaintiff's claims." Id., 582. "[T]he reasoning in *Fennell* applies under the circumstances of this case. The water and sewer authority simply had no authority to establish the plaintiff's salary. . . . [B]ecause the water and sewer authority lacked the authority to set the plaintiff's salary, and because the town council did not approve the suggested

salary, the court properly determined that the plaintiff's wage claims were precluded under the theories of implied contract, unjust enrichment and quantum meruit." Id., 582–83.

General Statutes (Rev. to 2001) § 7-450 provides in relevant part that "[a]ny municipality or subdivision thereof may, by ordinance establish pension and retirement systems for its officers and employees . . . ." The court found, and the plaintiff does not dispute, that "[i]n Middlebury, the town meeting, upon recommendation of the board of selectmen, has the sole authority to enact ordinances. See Middlebury Town Charter §§ 304D and 904G. Furthermore, there is no ordinance delegating [that] authority to amend the [plan] or otherwise to confer retirement benefits upon municipal employees or retirees."

The plaintiff's claim of promissory estoppel rests on the representation made in the December 4, 1995 letter by the plan's actuary, which was shared with the plaintiff by the defendant's finance director, calculating that the plaintiff would become eligible for a monthly benefit of $658.89 pursuant to the normal retirement provisions of the plan on December 1, 2004. That claim fails under the *Fennell* doctrine because neither the actuary nor the finance director possessed the authority to modify the terms of the plan.

Under Connecticut law, agents of a municipality "have no source of authority beyond the charter"; (internal quotation marks omitted) *Fennell* v. *Hartford*, supra, 238 Conn. 813; and "[a]ll who contract with a municipal corporation are charged with notice of the extent of . . . the powers of municipal officers and agents with whom they contract, and hence it follows that if the . . . agent had in fact no power to bind the municipality, there is no liability on the express contract . . . . Thus, every person who deals with [a municipal

corporation or its agent] is bound to know the extent of its authority and the limitations of its powers." (Citation omitted; internal quotation marks omitted.) Id., 814; see *Keeney* v. *Old Saybrook*, 237 Conn. 135, 149, 676 A.2d 795 (1996). As a result, the plaintiff is charged with notice that neither the actuary who prepared the December 4, 1995 letter nor the finance director who shared its contents had the authority to modify the terms of the plan.

Such notice undercuts the plaintiff's reliance on *Chotkowski* v. *State*, 240 Conn. 246, 268–69, 690 A.2d 368 (1997), in which our Supreme Court noted that "estoppel against a public agency is limited and may be invoked: (1) only with great caution; (2) only when the action in question has been induced by an agent having authority in such matters; and (3) only when special circumstances make it highly inequitable or oppressive not to estop the agency." (Internal quotation marks omitted.) Because the court found, and the plaintiff on appeal does not contest, that neither the actuary nor the finance director possessed the authority to "confer eligibility for a [normal] retirement benefit upon the plaintiff," it follows that the plaintiff was not induced by an agent having authority over such matters.[5]

Perhaps unmindful of our decision in *Biello*, the plaintiff also argues that *Fennell* is distinguishable because it "was not a promissory estoppel case." As already discussed, this court has held that the *Fennell* doctrine is not limited to claims of implied contract, but, rather, it also extends to other claims including unjust enrichment and quantum meruit. *Biello* v. *Watertown*, supra, 109 Conn. App. 583–84. Moreover, although the plaintiff pursued an implied contract claim in *Fennell*, the

[5] In opposing the defendant's motion for summary judgment, the plaintiff neither argued nor provided documentary support indicating that the actuary or the finance director possessed the authority to modify the eligibility requirements for a normal retirement benefit under the plan.

Supreme Court did not so confine its analysis in dismissing that claim. Instead, it recognized that "[c]ourts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis for a contract *or an estoppel*." (Emphasis added; internal quotation marks omitted.) *Fennell* v. *Hartford*, supra, 238 Conn. 816. Likewise, the court concluded its analysis by noting that "no ratification *or estoppel* can make lawful a municipal contract which is beyond the scope of the corporate powers, or which is not executed in compliance with mandatory conditions prescribed in the charter or statutes . . . ." (Emphasis added; internal quotation marks omitted.) Id., 818–19. As in *Biello*, we conclude that the reasoning in *Fennell* applies under the circumstances of the present case.

Furthermore, the plaintiff's notice that neither the actuary nor the finance director had the authority to modify the terms of the plan renders his promissory estoppel claim untenable in a more basic sense. It is axiomatic that to maintain such a claim, it is not enough that a promise was made; reasonable reliance thereon, resulting in some detriment to the party claiming the estoppel, also is required. See, e.g., *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 213, 520 A.2d 217 (1987) ("a promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all"); *Finley* v. *Aetna Life & Casualty Co.*, 202 Conn. 190, 205, 520 A.2d 208 (1987) (promissory estoppel requires reasonable reliance on the misleading conduct), overruled in part on other grounds by *Curry* v. *Burns*, 225 Conn. 782, 786, 626 A.2d 719 (1993); 1 Restatement (Second), Contracts § 90 (1) (1981) ("[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which

does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise"). Because the law charges the plaintiff with notice that neither the actuary nor the finance director had the authority to modify the terms of the plan, any reliance on the actuary's December 4, 1995 letter cannot be deemed reasonable.

Throughout the course of this litigation, it has been the plaintiff's steadfast position that he is entitled to a normal retirement benefit. In part I of this opinion, we concluded that the plain and unambiguous terms of the normal retirement provisions of the plan required the plaintiff to work for the defendant as a full-time police officer until he either (1) attained the age of fifty-five with twenty-five years of credited service, (2) attained twenty-five years of credited service sometime after turning fifty-five or (3) attained the age of sixty-five. He did not comply with those requirements. Accordingly, to survive the defendant's motion for summary judgment, the plaintiff had to establish the existence of a genuine issue of material fact as to whether the actuary or the finance director was authorized under the town charter to modify the requirements for a normal retirement benefit under the plan. He failed to do so. We therefore conclude that the court properly rendered summary judgment in favor of the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.